Estate of Thomas H. Hartley v. Commissioner.
Estate of Hartley v. Commissioner
Docket No. 112054.
United States Tax Court
1944 Tax Ct. Memo LEXIS 407; 3 T.C.M. (CCH) 3; T.C.M. (RIA) 44003; January 3, 1944
*407 Held, that the value of a mortgage included in the gross estate of a decedent was, at the time of his death, $15,000 as determined by the respondent rather than $12,500 as shown in the estate tax return. Held, further, that interest derived from other mortgages and rentals, derived from certain other property, both the mortgages and other property being owned by decedent's wife, and which interest and rentals were used in decedent's business, constituted a claim of decedent's wife against the estate of decedent and the amounts thereof are deductible from decedent's gross estate. Robert H. Littleton, Esq., Tower Bldg., Washington, D.C., for the petitioner. Frank M. Thompson, Jr., Esq., for the respondent. TYSON Memorandum Findings of Fact and Opinion Respondent determined a deficiency in the estate tax of Thomas H. Hartley, deceased, in the amount of $8,227.81. The deficiency arose by reason of respondent (1) increasing the value of a mortgage, included in the gross estate at $12,500, to its face value of $15,000; and (2) disallowing deduction of a claim of $43,948.06 claimed to have been held by the wife of decedent against him at the time of his death, which disallowance *408 was stated in the deficiency notice to have been "because the claim was not contracted bona fide and for an adequate and full consideration in money or money's worth." At the hearing petitioner reduced the amount of the claim to $32,448.06. Petitioner otherwise contests the action of respondent as to both the increase under (1) and the disallowance under (2) above. Findings of Fact The decedent Thomas H. Hartley, residing at the time of his death at 1306 South Hull St., Montgomery, Alabama, died July 18, 1939. His wife, Enola Hartley survived him, and is the duly appointed and qualified executrix of his estate. She is the principal beneficiary under his will. The Federal Estate Tax return was filed in the District of Alabama. Among the estate assets was a mortgage executed by M. Sabel & Sons, Inc., in the face amount of $15,000, dated January 26, 1928, due in five years, and bearing interest at 6 percent. The property covered by the mortgage is a twostory brick and concrete, metal roof store building located at 108 W. Bibb Street, Montgomery, Alabama. The property is approximately twenty-five feet wide and between ninety and ninety-five feet deep. The building was erected shortly *409 after a fire at that location in 1927. The mortgage secured a loan made when the present building was constructed. The premises were used by M. Sabel & Sons, Inc., as an office and junk store. The city required removal of a junk yard adjoining the building, and the building has since been vacant except for temporary occupancy by a telephone company, at a rental of $125.00 a month on a month-to-month basis. The Montgomery County court house records do not show any other property in the name of the mortgagor. While the principal on the mortgage is past due since January 26, 1933, the interest thereon has always been paid, being paid at first by the mortgagor corporation, and later when the corporation became inactive, by M. Sabel and his brother-in-law, who, together, owned all the stock of the corporation and who, together, personally operated a junk business. When the interest was not otherwise paid, it was collected by deducting it from bills rendered by M. Sabel and his brother-in-law for iron and scrap steel purchased from them by the Hartley Boiler Works, of which the decedent was the sole owner. The corporate-mortgagor is still in existence, and still owns the mortgaged property. *410 Decedent conducted his business under the name of Hartley Boiler Works, which, though not incorporated, kept its records and accounts separate and distinct from those of the owner, as if it were a corporation. The Boiler Works kept an individual personal account with decedent similar to the separate account that a corporation would carry for one of its shareholders or officers. The corporation was referred to by both decedent and its employees, as the "company" and will hereinafter sometimes be so referred to. Decedent had no personal bank account, and all checks for funds which he drew from his business for personal and non-business use were recorded in his personal account with the "company." In September 1927, decedent began investing in mortgages which were the subject of gifts from him to his wife. The method adopted in making such gifts was as follows: Decedent would instruct the company's bookkeeper to draw a company check in a specified amount, payable to the prospective mortgagor. The amount of this check was charged to decedent's personal account with the company and an entry made on the records thereof showing the amount of the mortgage, the name of the borrower, and *411 further notations, such as "Check - wife"; "Loan for wife", "Loan in wife's name", "For Mrs. Hartley", or "Given to Mrs. Hartley." Such notations were made by the bookkeeper in the case of each mortgage pursuant to decedent's instructions. On each such occasion decedent would tell the bookkeeper that the item was for a loan, or a mortgage that he was giving to Mrs. Hartley. Whenever each of such gifts was made decedent would tell his wife that he had made her a gift of a mortgage. Each of the checks, so drawn, was delivered to an attorney for delivery to the mortgagor, and the attorney drafted the notes and mortgage for each loan when made, and the notes and mortgage were made payable to decedent's wife, Enola Hartley. In the instance of each mortgage the attorney would furnish a written opinion as to the title of the mortgaged property, which opinion was addressed to "Mrs. Enola Hartley, Montgomery, Alabama," and later a similarly addressed letter would be signed covering the return of the mortgage after its recordation in the proper county records. Practically all the mortgages were accompanied by fire and tornado insurance policies on the mortgaged property made out in the name *412 of Mrs. Hartley. As the papers were too bulky to mail, the attorney would telephone the bookkeeper of the company when they were ready, and the bookkeeper would then call for them, picking up the mortgage, notes, abstract, opinion of the attorney as to title, and insurance policies, returning with them to the company office, where the abstract, opinion of the attorney and insurance policies, because of their bulk would be kept in an extra safe, while the mortgage and notes would be enclosed in an envelope and placed in a safety deposit box at the bank held in the name of T. H. Hartley. The envelope would be inscribed with the name of the mortgagor and mortgagee, as for example, "Frank A. Rhodes and wife to Mrs. T. H. Hartley" and would have listed thereon the principal and interest, notes by amount and maturity date. The personal account of decedent with the company shows charges for mortgage loans made for Mrs. Hartley during the period September 3, 1927 to May 26, 1939 of $65,250 and credits of $15,000 received from her, which credits also covered mortgage loans made in her name, but out of funds supplied by her rather than by decedent, or from the proceeds of principal payments *413 collected by him on mortgages previously made for her. As an example of loans made out of funds supplied by Mrs. Hartley, the account shows a charge on September 22, 1932 of $6,000 for the J. M. Jenkins loan, and shows a credit September 26, 1932 of $1,000 received from Mrs. Hartley on the Jenkins loan. These entries show that only $5,000 of the $6,000 loan was a gift from decedent to his wife. The net amount of decedent's funds invested by him in mortgages given to his wife was $50,250. Under instructions from decedent the company bookkeeper kept a memorandum book listing all the above mortgage loans as owned by Mrs. Hartley so that payments thereon could be kept up to date. All principal and interest payments on the mortgages were handled through the company office. All such payments were by check made payable to Mrs. Enola Hartley. The check would be received by the bookkeeper who turned it over to decedent. Decedent would take it home, obtain his wife's endorsement and return it to the bookkeeper. Where the check was a payment of principal it would be deposited in the bank account of the company and credited to decedent's company account, if decedent was planning to use it in *414 making another loan for his wife but if his wife needed the money personally it would be deposited direct to her personal bank account. When the proceeds of principal payments so credited to decedent's company account were insufficient to cover a contemplated loan, decedent would make up the difference from his own funds as a gift to his wife. Where the checks were in payment of interest they would all be deposited in the company bank account, and credited on the company books to the company rental and interest account. The total amount of interest so collected and credited was $28,800.24, of which $20,260.08 was collected subsequent to 1932. Some of the mortgages were foreclosed and the properties covered thereby were bid in by Mrs. Hartley in her name. The rents from these properties thereafter were collected by the company and credited to its rental and interest account. The net amount of rents received during the period 1931 to 1939 was $3,647.82 after deducting taxes and repairs, of which $3,142.89 was collected subsequent to 1932. The company's interest and rental accounts were closed at the end of each year and the profit on them was credited to the company's investment account. *415 None of the interest or rental payments were ever credited to decedent's personal account. The interest of $28,800.24 and rents of $3,647.82 have never been paid over to Mrs. Hartley and are still represented in the assets of the company and were included therein in computing the net worth of the company and in arriving at the gross value of the decedent's estate. No account was ever set up on the company books in favor of Mrs. Hartley although the company auditor frequently discussed the matter with decedent, who would postpone doing so because of the pressure of other matters. Mrs. Hartley had only one personal banking account and the bookkeeper kept her bank book and made all deposits for her. In addition to deposits of principal payments received by her on her mortgages and interest payments received from mortgages purchased solely from her personal funds, this account also contained deposits of $375 monthly which was given to her by decedent to cover household expenses. Each year decedent and his auditor would review the mortgages given to his wife and charged to his personal account to make certain the aggregate amount was not such as to require the filing of a gift tax return *416 or exceed "the limit of the gift tax." Prior to 1936 decedent and his wife filed joint income tax returns. In 1936, 1937 and 1938 they filed separate returns. The wife's separate returns were prepared by the company auditor and bookkeeper. The income returned therein as derived from bonds, notes and mortgages was computed by totaling all of the mortgage income carried on the company books but derived from her mortgages, and adding thereto all the income items appearing in her personal bank book for the tax period involved. Income from rents belonging to her but carried on the company books was also reported as her income. All of the mortgage loans made by decedent for his wife, except one of $3,000, were made prior to 1933. This decrease in loan activity after 1932 was due to the depression and the fact that the government began making loans at lower rates of interest. Shortly before decedent's death, he told his bookkeeper, "My wife now has about $100,000 of her own." In the estate tax return filed for the estate of decedent there was listed on Schedule K as "Debts of Decedent" the sum of $43,948.06 owed to his wife Enola Hartley for collections of principal and interest on mortgages *417 owned by her, and collections of rents on properties owned by her, and received by decedent and used in his business. In his determination of a deficiency the respondent disallowed this amount as a claim against the estate. At the hearing petitioner reduced this amount to $32,448.06, which latter amount is composed entirely of the interest and rents here in controversy. Also in his determination of a deficiency respondent increased the value of the M. Sabel & Sons, Inc. mortgage from $12,500 as reported in the estate tax return to $15,000. Opinion TYSON, Judge: The building on the property mortgaged by M. Sabel & Sons, Inc. is a two-story brick and concrete structure, twenty-five feet wide by a depth of between ninety and ninety-five feet, which was about twelve years old at the time of decedent's death. The loan of $15,000 was made when the building was constructed. The only direct testimony as to the value of the mortgaged property, at the time of decedent's death, including the building and lot upon which it was located, was that of a witness for petitioner that its fair market value was then $12,500. The only factors he used in determining this value were that it was a one store *418 building by itself in one block and that he did not think it was so situated as to be attractive for business. This testimony does not convince us that the property had a fair market value, at the crucial date, of less than $15,000, especially since there is no evidence presented as to why a piece of property of such a substantial value as to warrant a $15,000 loan thereon should depreciate to a value of $12,500 or to any value less than the amount of the mortgage within a period of twelve years. Moreover, apart from the question of the value of the property securing the mortgage indebtedness, there is no convincing evidence that such indebtedness is uncollectible from sources other than from the mortgaged property. Although no part of the principal of the mortgage has ever been paid, the interest thereon has always been paid either by the mortgagor-corporation or personally by its stockholders. The mortgagor-corporation is still in existence and continues to own the mortgaged property. There was no delinquency in the payment of interest on the mortgage and there was no evidence of delinquency in the payment of taxes or insurance premiums on the property nor of any steps ever having *419 been taken directed toward foreclosure. It was sought to be established that the corporation possessed no assets other than the mortgaged property but evidence to that effect was limited to testimony that the court house records disclosed no other property owned by the mortgagor in the same county in which the mortgaged property was located. In our opinion petitioner has failed to establish that the fair market value of the mortgage on the crucial date was less than $15,000 and respondent's determination of that amount as such value is approved. Petitioner contends that the amount of $32,448.06 composed of the interest and rents here in controversy is a valid claim of Mrs. Hartley against the estate of decedent, and in the alternative that "it should be eliminated in computing the gross value of $259,940.87 for the estate of decedent," because it was always her property and never that of the estate of decedent. Respondent concedes in his requested "Findings of Fact" as follows: "These amounts of interest, $28,800.24, and rents, $3,647.82, [comprising the $32,448.06] have never been physically paid over to Mrs. Hartley as such and are still represented in the assets of the Hartley *420 Boiler Works. In computing the net worth of the Hartley Boiler Works for the purpose of arriving at the gross value of the estate of the decedent, these items were represented as part of its net worth." The interest in issue was derived from mortgage loans and accompanying notes executed in favor of decedent's wife, and the rents in issue were collected, on foreclosed properties held in the wife's name which properties originally were security for other mortgage loans executed in her favor. Respondent attacks the wife's title to the mortgages on the theory that the decedent failed to make "valid and unqualified" gifts thereof to her. The net amount of decedent's funds invested by him in the mortgages which petitioner contends were given to his wife during the period 1927 to 1939 was $50,250.00. When each of the mortgage loans was made, decedent instructed his bookkeeper to draw a check in favor of the borrower, and to note in his personal account with the company the purpose for which it was drawn, such as "Loan for wife" or "Given to Mrs. Hartley," together with the name of the mortgagor. On each such occasion he told his bookkeeper that he was giving Mrs. Hartley another mortgage, *421 and he would tell his wife that he had made her a gift of a mortgage. The checks so drawn were all delivered to the same attorney who prepared the papers for all of the mortgages involved. The mortgages, notes, insurance policies, and opinions of the attorney as to titles of the mortgaged properties all ran in favor of decedent's wife, "Enola Hartley." Each mortgage was recorded, and thereafter was delivered by the attorney to decedent's bookkeeper under a covering letter addressed to "Mrs. Enola Hartley, Mortgomery, Alabama." Decedent's bookkeeper would then prepare an envelope inscribed with the name of the mortgagor and that of decedent's wife as mortgagee. The mortgages and notes secured by them would then be enclosed in the envelope and the envelope placed in decedent's safety deposit box at the bank. Thereafter the loans would be serviced by decedent's bookkeeper who also kept a memorandum book, under instructions from decedent, listing the mortgages as those of Mrs. Hartley. The bookkeeper also handled Mrs. Hartley's bank book and made all her deposits in bank for her. Remittances of principal and interest on the mortgage notes were by check payable to Mrs. Hartley, who indorsed *422 them before they were cashed, some of the remittances covering principal being deposited in her personal bank account. Each year decedent would have his auditor check the foregoing mortgages for gift tax purposes, and in 1936, 1937, and 1938 when decedent and his wife filed separate income tax returns, the income from these mortgages was included in the wife's return as her income. In our opinion the cumulative effect of the enumerated facts all established by uncontradicted testimony, and the other facts of record, leave no room for justifiable doubt that the mortgages involved were given as completed gifts from decedent to his wife. Respondent argues that the gifts of the mortgages were incomplete because "the evidence does not show a clear and unmistakable intention on the part of the decedent to divest himself absolutely and irrevocably of the title, dominion, and control of the property." He places special reliance on the fact that the mortgage papers were kept in decedent's safety deposit box. This was an obvious place for their safekeeping. For husband and wife to have separate deposit boxes would probably be the exception rather than the rule, and, the fact that the mortgages *423 were kept in the decedent's safety deposit box affords no support to this argument, since the mortgage papers were segregated therein, specifically identified on the envelope containers as mortgages payable to the wife, and in so far as dominion and control thereof is involved, the record shows them to have been complete in decedent's wife. Her dominion and control were both exhibited and exercised each time the principal and interest checks were brought to her for endorsement and she testified that she could have had the mortgage papers at any time she desired. Retention of the mortgage papers in decedent's box was apparently purely a matter of convenience in servicing the loans. The mere fact that the mortgages in her name had been recorded would appear to be sufficient to complete the gifts in Alabama where they were executed and where the property covered by the mortgages was located. The Supreme Court of that state recently held in Taylor v. O'Barr, 6 So. Rep. (2nd) 414, where a husband as complainant in a suit to cancel a deed made to his wife, that recordation of the deed constituted delivery thereof to his wife saying, inter alia, Complainant *424 must rest, therefore, upon the mere fact that he retained possession of the deed. But upon this question we think the Arkansas Court in Russell v. May, 77 Ark. 89, 90 S.W. 617 has given a sufficient answer to the effect that the husband's duty is to look after the wife, that the deed being for her benefit will be presumed accepted by her and his mere retention of the deed did not suffice to overcome the prima facie case of delivery by recordation. 18 C.J. 206; 26 C.J.S., Deeds, Par. 43. Cf. Gulledge et al. v. Mitchell, (Ala.) 242 Ala. 342, 6 So. 2d 22; Garrett v. Keister, (D.C.) 61 App. D.C. 25, 56 F.2d 909. The deficiency notice denies the wife's claim on the ground that it "was not contracted bona fide and for an adequate and full consideration in money or money's worth" and on brief respondent relies more particularly on that portion of section 812 (b) (5) of the Internal Revenue Code reading as follows: The deduction herein allowed in the case of claims against the estate, unpaid mortgages, or any indebtedness shall, when founded upon a promise or agreement, be limited to the extent *425 that they were contracted bona fide and for an adequate and full consideration in money or money's worth. As we have seen, the wife's claim is for collections of interest on mortgage notes which we have determined were her property, and collections of rent from other properties of hers which she had received through foreclosures of mortgages also belonging to her. Those collections were made by the decedent and retained for use in his business, and respondent concedes they have never been paid to her, "as such" and that they "are still represented in the assets" of decedent's business and "were included in arriving at the gross value of the estate of the decedent." When it is decided, as we have, that the properties from which such collections were made by decedent were the properties of his wife and it is further shown, as it is here, that the decedent retained such proceeds in his business and had never paid any portion thereof to his wife, it obviously follows that the wife's claim to the proceeds of such collections "is for an adequate and full consideration in money or money's worth" and it is immaterial that some of the collections representing interest on mortgages were derived *426 from property originally acquired by the wife as gifts from her husband. There is no contention and no evidence that the wife ever made a gift of such proceeds to decedent and it is apparent from all the facts that there was an intention on the part of the decedent to repay such proceeds and an expectation by petitioner of such repayment. This brings us to consideration of what seems to be another contention of respondent's, viz., that the collections of interest and rent by decedent had in fact been accounted for and repaid the wife in the form of some of the mortgage investments he purchased for her. In other words, respondent argues that when decedent apparently was using his personal funds to "make a mortgage" for his wife, he was thereby actually accounting to her for the interest and rent collections due her, and that to the extent of such indebtedness to her, the mortgage was not a gift by decedent to his wife but was payment of his indebtedness of such interest and rent. A recapitulation of certain facts is necessary. Principal payments on the wife's mortgages were deposited in her bank account when she needed the money, otherwise they were deposited in the company bank *427 account and credited on the company books to decedent's personal account. All of these principal payments so credited to decedent were subsequently accounted for and are not in issue because whenever decedent made a new mortgage loan for his wife he used the balance of such principal payments in his account, supplying any deficiency therein with sufficient of his own funds to equal the amount of the proposed loan. Interest and rent collections were handled differently. All checks received in payment thereof were deposited in the company bank account and credited on the company books to its rent and interest account and at the end of each year the amounts so credited were transferred to the company's investment account. There is no dispute that the total so collected and credited was $32,448.06. None of this interest or rent ever went into decedent's personal account with the company against which personal account were charged all funds used in acquiring the mortgages in question. The only funds of the wife collected by the company and deposited to its account, which were used to purchase mortgages, were the collections of principal, which in every case were credited on the books to *428 decedents' personal account and not to the company rent and interest account. There is admittedly no evidence of repayment to her of the interest and rentals, "as such," and there is no evidence of their repayment to her through the purchase with them of mortgages for her by decedent, or otherwise. Furthermore, it may be observed as to this contention of respondent that the evidence shows that decedent did not make mortgage loans totaling in excess of $3,000 for his wife after the year 1932. It further shows that the total rent and interest collected after that date and credited to the company rent and interest account was $23,402.97. Manifestly, if respondent's theory were correct, it could be correct only to the extent of the $3,000 mortgage purchased after 1932, thereby leaving over $20,000 in the rent and interest account which it would have been physically impossible to use in the purchase of any of the mortgages because none of such $20,000 had been collected when they were made. The contention of respondent that the collections of interest and rent by decedent were repaid his wife in the form of some of the mortgage investments made for her is untenable. The action of respondent *429 in disallowing the deduction of the claim of decedent's wife against his estate is disapproved to the extent of $32,448.06. Decision will be entered under Rule 50.